## Kentucky Wagon Manufacturing Co. v. Gossett.

(Decided March 18, 1911.)

### Appeal from Jefferson Circuit Court (Common Pleas Branch, Second Division).

Personal Injury—Action for Damages—Assurance of Safety—Assumption of Risk—Peremptory Instruction.—Appellee who made a specialty of painting high and dangerous places contracted with appellant to paint its water tower, consisting of a tank resting on twelve steel posts supported by numerous cross bars of steel. Two water pipes extended from the tank to the ground   At places 24 and 48 feet from the ground there were certain small iron guy rods, five-eights of an inch in diameter running from the cross bars to the casement containing the water pipes which were placed there to keep the water pipes in position. Appellee furnished his own rigging. In attaching his rigging to the tank he discovered that the timbers were rotten. He reported this fact to appellant's superintendent. At the same time he asked the superintendeut what was the condition of the steel work under the tank. He claims the superintendent said in reply: "That is first class; that is all right; that is in first- class con dition and will hold anything." Appellee then went to work. In shifting his rigging he stepped upon one of the iron guy rods which gave way precipitating him to the ground and severely injuring him. Held that in the assurance of the master to the effect that the steel work was all right and would hold any thing, could not be extended beyond the fair import of the words employed so as to make it include an iron guy rod not designed to bear a cross strain and so small that the danger of stepping upon

it must have been apparent to one of appellee's experience in such matters; that if he voluntarily stepped upon the rod he assumed the risk, or if he lost his balance and placed his foot upon the rod for the purpose of steadying himself his injuries were the result of an accident. In neither case is appellant liable, and the court should have awarded appellant a peremptory instruction.

HELM & HELM for appellant.

M. A., D. A. and J. G. SACHS and O'DOHERTY & YONTS for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

Appellant, Kentucky Wagon Manufacturing Company, has on its premises a water tower consisting of a steel structure sixty-three feet high, on top of which is situated a tank sixteen feet high. The steel structure consists of twelve perpendicular posts of standard steel, six and one-half inches in diameter, set in the form of a maltese cross. Of these posts, the inside four are seven feet apart. To the rear of these and fourteen feet therefrom, the other eight posts are set. The whole trestle is built on concrete piers sunk in the ground. At four points, viz., at twelve, twenty-four, thirty-six and forty-eight feet above the ground, these perpendicular posts are braced by horizontal three-inch standard steel pipes. Each square or rectangle formed by the perpendicular posts and horizontal pipes is braced and held in position by two three-quarter-inch wrought iron rods, running diagonally between the corners in the shape of the letter "X." From the center of the bottom of the water tank two water pipes, one six and one eight inches in diameter, encased in a wooden boxing three feet square, extend to the ground. To keep these pipes from getting out of plumb or from buckling, an iron guy rod five-eighths of an inch in diameter is run from each of the four six and one-half-inch inner posts through the wooden casement and screwed for three-eighths of an inch into an iron collar which encircles the two water pipes. Each of these guy rods is fitted into a boss on the iron castings on the uprights. These guy rods are situated at the second and fourth cross sections, which are, respectively, twenty-four and forty-eight feet from the ground.

Appellee, C. W. Gossett, while engaged in painting appellant's water tower, stepped upon one of the five-

eighths-inch guy rods running from a cross bar to the wooden casement; the rod gave way, and he was precipitated to the ground. He brought this action against appellant to recover damages for the injuries he received. The jury returned a verdict in his favor for $2,500, and from the judgment based thereon the Kentucky Wagon Manufacturing Company appeals.

Appellee is a contract painter, and his specialty is the painting of high and dangerous places, such as smoke stacks, towers and bridges. When engaged in such work he always furnished his rigging. This he did on the occasion of his injury. His rigging consisted of a boatswain seat (that is, a seat suspended by ropes on block and tackle), two long poles with a hook upon them, and some light planks or boards about nine feet long to reach across from one brace of the structure to another, seven feet away, thereby making a temporary floor from which he could do the work.

In October, 1908, appellee entered into a contract with appellant, by which he agreed to paint the water tower, including all parts thereof, for the sum of $40. About a week thereafter he brought his rigging and went up to the top of the tower to see about hooking the rigging on. He found that the shingle roof was in bad condition. He then says, "I told Mr. Waters (the superintendent) about it, and he said, 'Well, throw it off, and I will give you $5 more.' I said, 'What is the condition of the steel work under the tank?' He said, 'That is first class, that is all right, that is in first class condition and will hold anything.' I told him all right." Appellee further testified that the structure was so complicated and close together that he could not paint it unless he climbed in and out on the different parts thereof.

Appellee began work on Monday morning. He worked from Monday until Friday noon. At that time he was standing on one of the cross pipes or rods with his weight thereon. He was then engaged in moving his rigging. At the time he had one of the poles in his hand. While looking up he stepped to the side on one of the guy rods running from the cross bars to the wooden casement. He did this, he says, for the purpose of balancing or steadying himself. He had stepped upon similar rods before, but always did so very lightly. The guy rod gave way and appellee was precipitated to the ground. In falling he struck upon some of the cross bars.

His principal injury consisted of a rupture of the kidney. While at the hospital an incision was made into his left side and back, seven inches long and four inches deep. The injured kidney was drawn up into the open and washed off. It was then packed with gauze and put back in place. Since the accident he had suffered great pain, and at the time of the trial was unable to do any physical work except little odd jobs in the way of running errands, etc.

The guy rod was bent some four or five inches by the weight of appellee. A small piece of the boss, of triangular shape, about an inch wide at the base and gradually tapering to a point about an inch from the base, was found to be broken out. In the opinion of one of the witnesses, that part of the casting from which this piece was broken looked like an old rust. He made this examination, however, about four days after the accident. The superintendent testified that he was unable to say how old the rust was; it might have been several months old. Other witnesses said the rust might have looked old after the lapse of a few days. The guy rod was not constructed to be used for the purpose of a cross strain, but only to hold the center iron pipes in position; for that purpose only the tensile strength of the guy rod was called into play. Appellant's superintendent admitted that he expected appellee to paint the entire structure; and to do this he knew he would have to go in on the cross parts of the under structure. Wherever his duty called him on that structure, he had to go. This witness denies giving to appellee any assurance of safety. The evidence further shows that the water tower was well and substantially built, and that all parts thereof were sufficient for the purposes for which they were intended. There is some evidence to the effect that a structure like that ought to be inspected every few months, but the weight of the evidence is that such a structure would last for a great many years; that the chief way of preserving it is to paint it, and that this had been done some two or three times, and that appellee was then engaged for the same purpose.

Appellee predicates his right to go to the jury on three propositions: First, that the superintendent admitted that he knew appellee, in painting the structure, would have to paint all parts of it, and would have to go in on the cross bars; second, that there was evidence

tending to show that the superintendent stated to appel-
lee, when asked as to the condition of the steel work
under the water tank, that it was first class, all right,
and would hold anything; third, that because a part of
the casting had been broken out and there was some evi-
dence tending to show that the rust in the place from
which it came was an old rust, this was a circumstance
from which the jury could infer that appellant. by the
exercise of ordinary care, could have known of the de-
fective condition of the guy rod. But, what was the ef-
fect of the assurance which he claims the superintendent
gave? Before appellee claims the assurance was given,
he had gone upon the roof of the tank for the purpose of
attaching his rigging. He stated that the roof was out
of repair. When he brought this fact to the attention of
the superintendent, he claims that the latter then gave
the assurance. Did the superintendent mean, by this as-
surance, that appellee could attach his rigging to any
part of the structure or that he could go upon any part of
the same, however small or insufficient for that purpose
it might be? Suppose the guy rod had been one-twentieth
of an inch in diameter, instead of five-eighths of an inch
in diameter; would appellee, under the assurance claimed
to have been given, have had the right to use it for the
purpose of bearing his own weight? Suppose, that in-
stead of being employed to paint the tank, he had been
employed to paint a building and had received assurance
that the building was safe; would this have justified his
attaching the rigging to a lightning rod or placing his
own weight thereon? Could he have stepped upon an
iron rod, placed in a window for the purpose of support-
ing an awning, and claim that he was entitled to recover
because the master had assured him the building was
safe? Appellee knew the size of the guy rod. He saw
that it was very small. He, himself, admits that in step-
ping upon similar guy rods he had done so very lightly.
Why did he do this? From no other reason than that he
must have realized that it was dangerous to make use
of the guy rod for that purpose. He knew more about
the conditions that confronted him than the superintend-
ent. His life work was that of going upon various struc-
tures and painting them. It is not shown that the guy
rod was insufficient for the purpose for which it was
used, or that appellee was injured while using the guy
rod for that particular purpose. If while standing upon

one of the cross bars the center pipes had swung out and injured him, because of the insufficiency of the guy rods, he might have had a cause of action. Here, however, the guy rod was being subjected to the cross strain of appellee's weight when it was not constructed for that purpose or within the reasonable contemplation of the master that it would ever be used for that purpose.

In the case of Saunders v. Eastern Hydraulic, et al., Co., 44 Atl. (N. J.), 630, it was held that the master's duty to take reasonable care to have the place in which he directs a servant to work, safe for that purpose, does not require him to furnish a mullion of a window in a flat roof strong enough to bear the weight or any part of the weight of a servant directed to go upon the roof and replace a pane of glass in the window. In discussing the question the court said:

"The purpose of the mullion in this skylight was to aid in the support of the panes of glass. The master's duty was to have it so constructed as to reasonably answer that purpose, but it is impossible to discover any ground in reason for imposing on the master any duty to have it so constructed as to have it bear the weight or any part of the weight of a servant, although engaged in repairing it. The duty of the master in this respect is like that of one who invites another to make use of some place or appliance, and is limited to the care requisite for the reasonable use thereof for the purposes for which it is designed."

Suppose, in the above case, the master had assured the servant that the roof was safe; would the principle have been different? Manifestly not. The doctrine of the above case finds support in Creberry v. National Transit Co., 28 N. Y. Supp., 291, where the plaintiff was injured by the giving way of a stay lath of a scaffold while he was leaning against it, and it appeared that the lath was intended merely to keep the posts upright and there was no evidence that it was insufficient for that purpose. To the same effect is Schmidt v. Leistekow, 43 N. W. (N. D.), 821. In the last case, a miller in the defendant's employ was injured by the giving way of a spout in the mill used for passing mill stuffs from one part of the mill to another, but upon which plaintiff had climbed to reach to a certain place. The spout was in its proper place, and was secured for the purpose for which it was intended. The court held that the defendant was

not bound to anticipate that the spout running between the different stories of his mill for the purpose of passing grain and mill stuffs from one place to another, would be used by one familiar with the purpose for which they were designed to bear his weight or serve in the office of a ladder, floor or platform.

This is not a case where the master imposed a new use upon a place or a new function upon an instrumentality. Even if he assured appellee that the steel structure was all right and would hold anything, he had no reason to anticipate that appellee would extend that assurance beyond the fair import of the words used, and make it include an iron rod no larger than a man's little finger—a rod so small that the danger of stepping upon it and subjecting it to such a strain must have been apparent to one of appellee's experience in such matters. If appellee intentionally stepped upon the guy rod, he assumed the risk. If he lost his balance and unwittingly placed his foot upon the guy rod for the purpose of steadying himself, his injury was the result of an accident. In neither case is appellant liable.

We, therefore, conclude that the trial court erred in failing to award appellant a peremptory instruction.

Judgment reversed and cause remanded for a new trial consistent with this opinion.